All right, our next case is ready with Rushing v. MS Dept of Child Protc Svc. We'll first hear from Mr. Dillard. Thank you, Your Honor. May it please the Court, my name is Joel Dillard and I represent Melissa Rushing in this Whistleblowing and Freedom of Speech case, Rushing v. MS Dept of Child Protc Svc. I want to take three minutes at the outset to highlight three quotes that I think are important in the case. The first is from a newspaper article. The quote is, high turnover rates within Hancock County MDCPS are a contributing factor to the county's high foster care rate. This is quoted in our reply at page 21. So this is from a newspaper article. It's a local elected official talking about the findings of a peer investigation, that's the legislative committee. The title of the article is, Another Hancock U Court Official Resigns, the Sixth in Six Months. And so the background for this article is that there had been just years and years of litigation in Mississippi about competency at CPS and the specific issue of high turnover among social workers and the lack of sufficient social workers to do the work. So, you know, in a typical case where there's a personnel issue, it might not be of public concern, but when you're dealing with this specific case, this specific agency, this specific context, what might normally be a minor sort of personnel issue becomes a matter of public concern. You have newspaper articles written when someone, when, you know, a functionary retires or resigns. The second issue, the second quote I want to highlight is a quote from Judge Lumpkin's deposition. And the quote is, My purpose was to have the best CPS workers here in this county to do what was in the best interest of the children. That's on the record at page 501. Youth court supervision is the first line of defense against an incompetent CPS. That's why the judge opposed the promotion of social work supervisor, Corey DeDuel, who later committed fraud against CPS and then was fired for criminally neglecting her own children. That's why the judge kicked the head social worker, Dana Spears, out of the county. That's why the judge blasted, in Pam Cross's words, that's why the judge blasted the regional director. And by the way, that's an issue about which in the interrogatories, the Pam Cross was not truthful. And you can compare that, the record where in the email she says she was blasted at 428 and in the record where they say she wasn't criticized under oath and interrogatory responses at 678. So this is the reason the judge relied on rushing to provide information about how things were going in the CPS office. She didn't trust DeDuel, she didn't trust Spears, she didn't trust Cross. And there's ample reason for it. Are you arguing that these communications with that judge are themselves protective speech? Yes. There are a number of communications that Ms. Rushing had with the judge and with the guardian ad litem with the intention of informing the court what was happening. And it's our position and it's our argument below that these conversations with the judge, telling the judge what was happening at CPS, that these are protective speech. But if it's just informing the court and not the broader public, why isn't that part of her duties as an employee who interacts quite a bit with that court? So her duties in interacting with the court involve informing the court about cases, talking to the court about specific situations with children. But her duties don't involve talking to the court about the disagreements among her coworkers or fraud committed by a coworker. That's something management is supposed to be doing, and they weren't. Our case law says it doesn't have to be listed in the job description. I mean, let's say someone in a prosecutor's office goes to a judge and says, I'm really concerned, I think my colleagues are concealing evidence. You'd say that's speaking as a citizen and not as a prosecutor? If they wrote a letter to the newspaper speaking as a citizen, I get that. But in going to a judge who you appear in front of, you think, why is that? Why isn't that part of your duties? So there's a case from the I don't remember the name of it, but there's a case in which an officer is an informant to the FBI. Right. And that was not part of his duties working in that sheriff's office, because even though he's he's a law enforcement officer and his job is to enforce the law, he's going outside his chain of command. He's bringing in additional help. There's there's another if we're talking about the same case, the case out of our circuit involved Shelby, Mississippi. They were the court found that even going to the FBI was was part of his. He was acting as as as a police officer, as a citizen. I can't. I'm sorry. I'm going to look that case up. But there are there's more than one case involving law enforcement. And in one case where someone was a confidential informant to the FBI, they were I think it was. Will it? But I don't want to I'm not I'm not certain off the cuff, but I want to turn to your hypothetical involving the prosecutor so I can answer your question. So the prosecutor, there is a case, Anderson, involving a law clerk, which I think is similar to your hypothetical involving the prosecutor. And in Anderson, there is actually two versions of Anderson. And the first version, I think it was on the pleadings. And in in Anderson, the the court concluded that. Just because you reported misconduct by your supervisor, in that case, it was a judge to the Ethics Commission and you were duty bound as an attorney to do that. That doesn't mean it was part of your ordinary job responsibilities and found that it wasn't part of his ordinary job responsibilities at that stage. Later, though, the evidence showed that among the other things that he was tasked as part of his job responsibilities, one of them was to comply with the judicial canons of ethics. And that canon of ethics, which and again, the key point here is not that he was bound by that as an attorney, but that he agreed to be bound by that. That was one of his listed job, listed job duties. And here, actually, the testimony from the commissioner is that Miss Rushing's job was not to report these things to the court. And that's why she was getting in trouble for it. And I think you'll find in their brief that the appellants, the appellees, I'm sorry, MDCPS takes the position that it was not part of her job to be talking to the court about this. And that's why they could get her in trouble for it, because she was doing what she wasn't supposed to be doing as part of her job. The third quote I wanted to mention here is a quote from the two managers. And in these emails between the two managers, Bryant and Cross, the quote is, she will not have information to share with the court, close quote. And the point there was they were discussing why they wanted to remove her from the county, why they wanted to take away supervisory job responsibilities. They wanted to keep her from giving information to the court. And so I think that the district court here found there wasn't sufficient evidence of motive. I think that's clearly incorrect. The evidence here, I think if you look every time they bring up anything Ms. Rushing does wrong, they're also bringing up her communications with the court. So it's I think the court actually admitted this and saying that it's clear from the emails and text messages. They thought Ms. Rushing was sharing too much information with the court. And again, I think, you know, if Ms. Rushing was an auditor and her job was to ferret out misconduct or if she was a, you know, a PR person or if she was the manager, if she was the regional director. Maybe these conversations would be part of her job because she needs to keep the court informed. But what happened is the court didn't feel that she was that she was getting good information from the people who were supposed to be giving it to her. So she was going to someone, Ms. Rushing, who clearly that was not part of her job and trying to get this information. And it's for a public purpose. It's clearly for a public purpose. So. That's the that's the three quotes I wanted to just cover at the beginning here. Well, we're almost we're almost towards the halfway through. Let me just to clarify, what what are the precise communications? And I have there's basically three incidents. What are the communications that you're saying are protected speech for which she was retaliated? I mean, I think the. Well, I'll let you what's the first one? I'm just a little confused now about what the communications are. Right. So. It is a little confusing because there's three incidences of retaliation that we address. But then there's the broader context of these communications which are going on. And the three incidences of retaliation. The first one is the. The counseling that was issued and the written documentation says that that was specifically because she talked to the guardian ad litem. About the about the voucher being false, the voucher issues. That's number one. I've got that one. What's what's the next protected speech in your view? So there's also the call to action letter, which I referred to in my brief. And there the disagreement is about whether there's sufficient evidence that the call to action letter was recognized as being sent by Miss Russian. And again, she testified she wrote her name on the envelope and the letter was discussed at the very same time as her transfer. And so that one is kind of most closely related to the transfer from Pearl River to Hancock. I mean, can you can you pinpoint the evidence in the record that that suggests that CPS knew that she authored that letter before the transfer? So I think there's I think there's two things to look at that are particularly persuasive in that regard. The first is. That the same meeting where they talk about this letter when this letter first comes up is the meeting when they make the decision to transfer her. The second point, I think, that connects the two is that if if you look at the letter and you compare it to a an email that Miss Rushing had sent to Miss Bryant earlier. They're almost I mean, in many places, they're almost word for word the same and they clearly deal with the same issues. So. It's reasonable for a jury to infer from that that she was able to put two and two together and that she's lying about it now. I mean, people rarely when they're aware that what they're doing is illegal. They rarely go out and write it down in an email or something. You have to use circumstantial evidence to prove motive. And that's the evidence we have. But to get back to the question about what was the timeline between the receipt of that letter and the adverse action. So specifically, the letter was received around September 27th. It was discussed on September 29th and on September 29th. It's all the day. Also, the day they made the decision to transfer her, which was communicated on October 2nd. So within either instantaneously or within a five day period, depending on how you look at it. I wanted to get back to discussing the protected speech because I don't I don't think it is limited to just those two instances. You know, there were a series of conversations, if you look at the reply on pages 24, 25, 26. Where they had conversations with the judge. So, for example, when Miss Rushing reported that they had recommended child visitation with a father who had a pending indictment for sexual abuse. And then the judge met with them and and cross his words, blasted them for it. In my view, that's protected activity as well. So that's from April. And and this this prior protected activity led up to the emails in June where they're discussing how they want to potentially move her out of the county and they want her to not have information to share with the judge. I'm trying to let me find that case that I was referring to. I believe it's Howell that involved the. That involved the FBI and the confidential informant. OK. Yes, that's different. The case I was referring to is Gibson versus Patrick. Yeah. And there's a lot of case law on this issue. There's no question about that. And it goes a lot of different directions. I think if you want to look at the most analogous case, it's probably the salch versus town of Edna case. And that's a case where the the secretary worked at a school district and she's called by the media and she says, yeah, the superintendent is leaving and give some information about the conditions. And it's a similar case because you have a backdrop of interest from the media and the public about the issue. You have someone who has nothing to do. I think this information and you have providing the information which is alleged by the employer to be a breach of confidentiality rules. So I think that's probably the closest analog for the current case. And I see my time is is up. So I'd like to reserve the remaining time for rebuttal. All right. You have reserved four minutes for rebuttal. Mr. Sanders, we'll hear from you. May it please the court. My name is Robert Sanders. I represent. I'm sorry. OK. I hope you can hear me. My name is Robert Sanders. I represent all of the appellants. Let me start by referring to the newspaper article that the plaintiff's attorney just mentioned. First of all, that newspaper article is not in the record. And it was not in the original brief from the plaintiff. It was in the rebuttal brief. But if you look at the footnote where it is referenced, you'll see it's from Hancock County. That is that's a different county than Pearl River County. And just the youth court judge that we're dealing with here was the youth court judge in Pearl River County, not in Hancock County. So I still don't think there's any anything in the record that references any public concern about anything in the in Pearl River County. Also, the plaintiff's attorney just talked about different reasons why the judge relied on rushing. I don't know that she relied on rushing for anything, really. In our brief, we have the site where she says she doesn't expect to be informed about everything that happens in that county. And the only thing she said she wanted was for the youth court, I mean, for the agency in that county to consider her suggestions on promotions. That's all the judge ever said she wanted. I think the case that the plaintiff's counsel was when he said Anderson, I suppose it was Anderson versus Valdez, a Fifth Circuit case. But that case simply makes the point that your honor made that all duties are not necessarily found in the job descriptions. And that, of course, that's obviously correct. Also, the plaintiff's counsel just said that the call to arms letter was discussed by the people in the Child Protective Services office in Pearl River County. I don't know where in the record that's found. I don't recall them. I don't recall any email where that is mentioned. And I'll point out, of course, this is a heavy email case. There are just tons of emails back and forth among the DH, the department or the agency personnel. And all the emails, I think, were quite key. And I don't recall seeing anything about that. Now, let me just talk just briefly about the three different incidents that they say she was retaliated against. The first was the verbal counseling that she received regarding the motel incident. That was clearly not intended. She had a person, a guardian ad litem, who was not an agency person in the meeting. And that clearly was not a public communication protected by the First Amendment. The plaintiff herself said that she only got the guardian ad litem in there because she were a neutral witness and so that the conversation could not be misconstrued by anybody. The district court found that her purpose in having the guardian ad litem present for that discussion was her own interest in her job. And I think that's correct. But there was no First Amendment issue there. Regarding the temporary transfer, the plaintiff has consistently ignored the true reasons for the transfer. One was in June of 2017. The plaintiff failed to follow up on reports of a child who was in an abusive situation. Dana Spears, one of the defendants here, had to step in and correct that. And then on September the 26th, just before the transfer, the plaintiff, who had on-call duty that night, ignored a call from a hospital which reported that a 13-year-old child had been raped by a family member. The plaintiff should have gone there immediately and made arrangements to protect the child. The plaintiff did nothing after getting the phone call and the 13-year-old girl was released back into the very family where she had just been attacked. And the plaintiff never mentions those. The plaintiff doesn't deny that those things happened. But those are obviously the very good faith reasons for transferring. And the transfer itself wasn't the important thing. The important thing was the transfer included a different assignment. The plaintiff was removed from her frontline duties and she was just an intake officer. You mentioned that Rushing was transferred because of that sort of child endangerment episode. But was that related at all to her termination or only to the transfer? No, Your Honor. Pam Cross was the regional director and she wanted the plaintiff terminated for that failure because that was a pretty egregious failure on her part. And one of the defendants, Wendy Bryant, who was the director for the entire southern part of the state of Mississippi, would not agree to the discharge. Wendy Bryant said, look, just transfer her and get her out of frontline duties. And then Wendy Bryant actually made the decision to discharge the plaintiff based on the voicemail she left with the county judge. Pam Cross and Dana Spears, who were the local employees in Pearl River County, were not aware of the voicemail and were not aware that the Jackson office was even thinking about firing Ms. Rushing. They found out that she was fired after the plaintiff found out she was fired. Well, let me ask you this. How is the timing of the letter and Ms. Rushing's transfer a week later not dispositive of this case? I mean, they're too close to not be unless you have an explanation for that. Yes, your honor, we found out about the letter. I'm not sure exactly when, but it was fairly late September, probably about the same time as the 13 year old got raped. But it was an anonymous letter. We did not know who sent it. Now, the plaintiff has suggested that we didn't even try to discover it. And that's correct. We did not want to start a witch hunt in that county. Then you start with, well, perhaps all of y'all are suspects right now until we find the person who actually did it. So we just ignored that. And that's the reality of it. Sometimes it's just better to ignore something like that than it is to, like I say, go on a witch hunt for it. Your clients had, even though it was an anonymous letter, that they did not know that Rushing had written it? Your honor, so far as I can understand, they did not. And again, there are so many e-mails back and forth between these people that if there was a, if somebody ever said something like, we need to do something about Pam Rushing because I think she sent that letter, it might be different. But there is not a hint of such an e-mail. There's not a hint of any active suspicion of the plaintiff here. In 24 of your brief, you mentioned there's not a lot of paperwork surrounding Ms. Rushing's discharge, and you call that unusual. It is. I agree, your honor. But the reason is. Why is that unusual? What's the explanation? Typically, a discharge recommendation will come in from a local county. And it will come up to the HR division in Jackson. And there will be some paper trail going back and forth. This is what happened and so forth. In this case, the person the plaintiff lied to about leaving the voicemail with the judge was the very person who discharged her. Like I said, she was, Wendy Bryant was the overall regional director for the southern part of the state. She lied directly to Ms. Bryant, the plaintiff did. And Ms. Bryant knew it because she had listened to the voicemail where the plaintiff identified herself. And so there was no need, there was not an investigation because Ms. Bryant was the decision maker and she was the one to whom the plaintiff lied. There was just no, there was no need for paperwork on this. And that's why, that's a very simple reason that there's not any paperwork. I mean, not to speak of. Obviously, there's something in the personnel file that she's to be discharged or something like that. But there's no investigation. The decision maker was the witness. I noticed in your answer you pled as a defense, qualified immunity. But you didn't move for summary judgment on that ground, right? I think, I was thinking about this earlier, but I didn't have a chance to look it up. I think we mentioned it in the summary judgment brief. But my recollection is that Judge Jordan did not mention it in his opinion. And that's why it wasn't briefed here. I could be wrong about that, but sometimes these cases run together, honestly. But I thought we had mentioned qualified immunity in the summary judgment motion. Okay. At least, I think it was Judge Lee. The order doesn't rule on those grounds. Maybe you did. I know it was in your answer. You also didn't seek to dismiss the state, I guess, under the 11th Amendment. I mean, that just gets one defendant out. Well, yeah, that's correct. Frankly, I'm not sure why. I guess it was Judge Lee instead of Judge Jordan. I'm sorry. Anything else you wanted to cover? Your Honor, I could go on for a few minutes. But I think, essentially, we just say that there could not be First Amendment speech involved here because there was no public concern out there about any of these issues. Her communications with the court were gossipy emails. I mean, gossipy communications really designed to hurt Pam Cross and Dana Spears. So I'll give back my time. I thought the judge in Judge Lee's ruling, the first incident where she's complaining about the vouchers and the ad litem is there, he says that's not protected speech. But I thought on the other two claims, we'll call them, he found it was. There's no causation, though, to show that that's what motivated. I think that's correct, Your Honor. You could look at the letter, the call to arms letter. She talked about criminality and so forth. But, you know, it just was not a motivating factor at all. All right. We have your argument. Thank you, counsel. Thank you. And now we have rebuttal. Four minutes. Go ahead, counsel.  So I wanted to address just a couple of things. First, the press reports and Hancock County. So Hancock County and Pearl River County are directly adjacent. They're run by the same regional director, Pam Cross. The region is the two counties. That's the region. And actually, Ms. Rushing was transferred to Hancock County from Pearl River. So the connection. Is it? Yes, I wanted to address that. So the article is not in the record. But the court can take judicial notice of it. Because this article is a public, publicly printed. And it was. I don't think newspaper articles that can be done. But anyway, let me ask you another question. Opposing counsel said that the September 27th, the call to arms letter. That there is no evidence that it was discussed. A few days later said that there was. Where in the record can you show us that it was discussed? I mean, putting aside just that it was. It was a matter that was discussed in the office. Sure. And I want to correct this because I started this. It's a call to action. She never used the word arms. We've all started using that. It just that was my mistake. But the call to action letter was discussed. I discussed it in my brief on reply on page 27. And we cited the cross affidavit at 478 in the record. The cross deposition transcript at 529 in the record. And also crosses copy of the letter itself at 628. And on the copy of the letter, she wrote that she received it from Ms. Bryant. And in the affidavit and depositions, she describes when and how she received it. So that's how. That's how we get that. I'm trying to say that it was actually a matter of, it was raised among people in the office. And I don't want to quote those, those. That language. Cause I don't have it right in front of me, but that's where we found that information. So if you will, that's, that's where you need to find that. The. I want to highlight one thing that I think is very clear as. Mr. Sanders noted earlier. The, none of the, you know, issues with the 13 year old or the, the other performance issues that they raised were a stated reason for termination, or even in the picture, they were, they disclaimed those completely. The second point I want to make about those is you can see. Every time they bring up any performance issues with Ms. Rushing and the emails. They're also talking about her speech with the court. It's just, they go hand in hand. They never seem to bring up one without the other. And I think that's very indicative of what's motivating them here. Really. I mean, they, they can look and they can talk about these performance issues and Ms. Cross might want to use them to persuade her supervisor to do something. But really they wanted to just keep her quiet and keep her from talking to the judge. And that's not a lawful factor. And trying to terminate her. I don't want to let my time expire without talking about the two state law claims, which are. The whistleblower protection act and McCarn. And I have 30 seconds. I don't think you brought those up on your opening discussion. So, so the rule would be, you can't then use it on Roboto and the other side doesn't have a chance to respond. I mean, we've, we've got your briefs on, on those claims and never understood your honor. I don't want it to give the impression. I'm waving anything. I know you don't, you don't wave anything. All right. Well, thank you. Counsel. The case is submitted and you can. You can be excused.